# 2002 DTA 146

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL, I REGION JUDICIAL DE SAN JUAN**

COALICION PRO PARQUE VERDE DEL ESTE, COMPUESTA ENTRE OTROS POR LA FUNDACION LUIS MUÑOZ MARÍN, COLEGIO NUESTRA SEÑORA DEL CARMEN Y LA ASOCIACION DE RESIDENTES DE PARQUE MONTEBELLO
Parte Recurrente

v.

ESTADO LIBRE ASOCIADO·DE PUERTO RICO; SECRETARIO DE JUSTICIA
Demandadas-Apelantes

Núm. KLCE-2002-00255

San Juan, Puerto Rico, a 30 de septiembre de 2002

Panel integrado por su Presidenta,·la Jueza Fiol Matta
y los Jueces González Rivera y Rivera Martínez

Fiol Matta, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Coalición Pro Parque Verde del Este (*"la Coalición"*), nos solicita que revoquemos la sentencia dictada el 7 de marzo de 2002 por el Tribunal de Primera Instancia, mediante la cual se declaró *"NO HA LUGAR"* su petición de Mandamus e *Injunction Preliminar y Permanente*. Examinado el expediente apelativo y el derecho aplicable, expedimos el auto, revocamos la sentencia recurrida y devolvemos el caso al tribunal de instancia para la continuación de los procesos de conformidad con lo aquí resuelto.

**I**

El 4 de febrero de 2002, la Coalición presentó una petición de *Mandamus* e *Injunction Preliminar y Permanente* ante el Tribunal de Primera Instancia, Sala Superior de San Juan, en la cual expuso que la Junta de Calidad Ambiental (*"la JCA"*) y la Junta de Planificación (*"la JP"*) obviaron su deber ministerial de conservar nuestros recursos naturales, plasmado en el Artículo VI, sección 19 de la Constitución del Estado Libre

Asociado de Puerto Rico, al aprobar la consulta de ubicación sometida por Parque de Capuchino, Inc., (*"Parque de Capuchino"*) para el desarrollo de 429 unidades de vivienda en una finca con cabida superficial de 40.41 cuerdas sita en el municipio de San Juan. ■ La Coalición arguye que en virtud de la Ley Número 9 del 18 de junio de 1970, también conocida como la Ley sobre Política Pública Ambiental, 12 L.P.R.A. § 1121 y ss., y el mandato constitucional de preservar los recursos naturales, es mandatoria la preparación de una Declaración de Impacto Ambiental (*"DIA"*) para el referido proyecto residencial.

Según la Coalición, aunque el proyecto aprobado cuenta con una Evaluación Ambiental (*"EA"*) que data del 1994, dicho documento *"no es el requerido por ley"* y *"los supuestos sobre los cuales se preparó han variado sustancialmente"*. Entre los factores que alega invalidan la EA preparada en el 1994, se encuentran los siguientes: el que no se tomara en consideración que por el proyecto discurre la Quebrada Sabana Llana; los desarrollos residenciales y comerciales localizados en los alrededores del proyecto en fecha posterior a la EA, que invalidan el estudio de tránsito preparado en aquella ocasión para propósitos de dicho documento ambiental; la necesidad de preservar y establecer zonas de amortiguamiento para el desarrollo urbano, según contemplado en el Plan de Ordenamiento Territorial del Municipio de San Juan; el desarrollo del Bosque Urbano Inés María Mendoza Rivera en terrenos aledaños y su posible expansión a la finca objeto del desarrollo en el caso de autos, bajo el concepto Parque Urbano del Este; la presentación del Proyecto del Senado 403 designando ciertas fincas, entre las que se encuentra la finca propiedad de Parque de Capuchino, como el *"Corredor Ecológico de San Juan"* en el cual se prohibiría la otorgación de permisos de construcción y se ordenaría al Departamento de Recursos Naturales y Ambientales adquirir todas las fincas que comprendería dicho proyecto ecológico y la designación por la JP de la residencia del ex gobernador Luis Muñoz Marín y su esposa como *"sitio histórico"*, en el 1997.

La Coalición también alega que en ausencia de una DIA, la aprobación de la consulta de ubicación en este caso es nula *ab initio*. Por último, expone que en el caso de autos la preparación de una DIA es necesaria, pues existe el agravante de que la consulta de ubicación del proyecto perdió vigencia en el 1997, al expirar la prórroga concedida por la JP mediante resolución del 13 de noviembre de 1996.

Por su parte, la JCA, la JP y Parque de Capuchino presentaron sendas solicitudes de desestimación y de oposición a los remedios solicitados por la Coalición. ■ En síntesis, adujeron que la solicitud de la Coalición no procede en derecho, en virtud de las leyes Número 323 de 6 de noviembre de 1999 (*"la Ley 323"*) y la Número 324 de 6 de noviembre de 1999 (*"la Ley 324"*). Arguyeron las demandadas que el texto pertinente y la exposición de motivos de ambas leyes evidencia la intención legislativa de evitar que se utilicen los recursos extraordinarios como mecanismos para lograr la revisión judicial de decisiones administrativas ni para modificarlas *"en sus méritos"*.

La Ley 323 enmendó la sección 4.2 de la Ley de Procedimiento Administrativo Uniforme (*"LPAU"*), 3 L.P.R.A. § 2172, para disponer que el mecanismo de revisión judicial es el remedio exclusivo para revisar los méritos de una decisión administrativa. ■ La Ley 324, por su parte, enmendó el Artículo 19 de la Ley Sobre Política Pública Ambiental para disponer que el *mandamus* no procederá *"para cuestionar una decisión de la Junta de Calidad Ambiental dando por cumplidos los requisitos del Artículo 4(c)"* de dicha Ley, 12 L.P.R.A. sec. 1124c, *"al considerar un documento ambiental"*. Dispone, además, que ello se podrá hacer *"exclusivamente en virtud de lo dispuesto en la Ley de Procedimiento Administrativo Uniforme"*.

Los codemandados argumentaron que la Coalición no había agotado ni los remedios administrativos ni los judiciales disponibles para cuestionar los dictámenes de las agencias concernidas. Además, adujeron que los hechos en los cuales la Coalición basó su petición son incorrectos, pues ninguna de las áreas adyacentes al proyecto aprobado han sido *"formalmente delimitadas como recursos o valores de importancia social, cultural o recreativa"*. También negaron que por el predio objeto del desarrollo discurriera algún *"cuerpo de agua"* o que existiera algún *"patrimonio histórico"* que justificara la preparación de una DIA. En fin, alegaron que en

este proyecto no se dan ninguna de las situaciones en las que la reglamentación requiere preparar una DIA. ■

Por último, los codemandados alegaron que la Coalición no fue diligente y que su propia inacción le impidió ejercitar en tiempo su derecho a solicitar la revisión judicial de las decisiones administrativas impugnadas. La JP arguyó que a la luz de la jurisprudencia interpretativa, este daño auto-infligido impide otorgar el *injunction preliminar,* pues la petición no cumpliría con el requisito de *"irreparabilidad del daño".* ■ Por su parte, la JCA argumentó que no procedía emitir un *injunction preliminar* en su contra, pues la agencia había llevado a cabo todas las actuaciones ministeriales que le correspondían al aprobar los documentos ambientales del proyecto y que, en todo caso, el remedio procedería contra el desarrollador, que era quien podía actuar sobre el predio de su propiedad.

El 7 de marzo de 2002, el tribunal de instancia dictó la sentencia objeto del recurso de autos. El foro apelado resolvió que los remedios extraordinarios solicitados por la Coalición eran improcedentes en derecho porque la Coalición no había cuestionado oportunamente, en el foro judicial, dos determinaciones administrativas fundamentales a su petición. La primera de estas determinaciones, según el tribunal, fue la resolución de 2 de octubre de 2001 de la JP que aprobó la quinta extensión a la consulta de ubicación 93-17-0435-JPU. A preguntas de la jueza de instancia, la representación legal de la Coalición admitió que no solicitó la revisión judicial de dicha resolución. La segunda determinación administrativa de la cual no se recurrió, fue la resolución número R-01-27-13 de 9 de enero de 2001 de la JCA, mediante la cual dicha agencia determinó que la vigencia de la EA sometida por Parque de Capuchino para el proyecto no estaba limitada al término provisto en el *Reglamento para el Proceso de Presentación Evaluación y Trámite de Documentos Ambientales* (*"RPPETDA"*), promulgado por dicha agencia en septiembre de 1999. ■ El foro *a quo* determinó, como hecho probado, que la Coalición no solicitó a la agencia la reconsideración de dicha resolución ni tampoco acudió en revisión judicial ante este Tribunal.

Sobre esta base, el tribunal de instancia resolvió que el recurso solicitado iba dirigido a revisar, en sus méritos, determinaciones administrativas de las agencias demandadas, lo cual sólo podía hacerse mediante el recurso exclusivo de la revisión judicial. Concluyó que las resoluciones de la JCA y la JP habían advenido finales y firmes y que de los documentos presentados por la Coalición no surgía que las agencias hubieran incumplido algún deber ministerial. Por tal razón, el tribunal desestimó la petición radicada por la Coalición y dejó sin efecto una orden de paralización que había dictado previamente en auxilio de jurisdicción.

El 18 de marzo de 2002, la Coalición presentó el recurso de autos. En síntesis, apela al rango constitucional del deber de preservar y conservar los recursos naturales y arguye que el recurso de *mandamus* está disponible para cualquier ciudadano que reclame de un funcionario público que cumpla con la política pública ambiental. Además, la Coalición expone que de conformidad con lo resuelto en *Colón Cortés v. Pesquera,* Op. de 19 de abril de 2000, **2000 JTS 72,** la disponibilidad del recurso de *mandamus* en esos casos no depende de que se hayan agotado los mecanismos para la revisión judicial.

El 27 de marzo de 2002, Parque de Capuchino se opuso a la solicitud de la Coalición y además solicitó la desestimación del recurso. Expuso, en primer lugar, que la Coalición no había cumplido con la Regla 40 de nuestro Reglamento porque sus alegaciones eran contrarias a lo que el tribunal de instancia había resuelto en su sentencia. ■ Además, señaló que el recurso *"omitió importantes hechos procesales en su relación de hechos"* y alegó otros hechos que eran incorrectos. ■ Parque de Capuchino también adujo que la Coalición no había agotado los trámites administrativos y judiciales requeridos por la LPAU. Por último, según Parque de Capuchino, la jurisprudencia citada por la Coalición en apoyo a su petición de *mandamus* se refiere a desarrollos que claramente requerían la preparación de una DIA, respecto a los cuales se había demostrado que las agencias habían incumplido con su deber ministerial al aprobar DIAs insuficientes o incompletas. Esta situación, según expone, es distinta a la de autos.

## II

Nuestra Constitución impone al Estado el deber de guardar el medio ambiente y velar por la conservación de los recursos naturales, para el beneficio general de la comunidad. 1 L.P.R.A. Art. VI, § 19. ■ A tenor con dicho mandato, el Artículo 4 de la Ley Número 9 de 18 de junio de 1970, conocida como la Ley sobre Política Pública Ambiental *("LPPA")*, impone al Estado, sus subdivisiones políticas, departamentos, agencias, corporaciones públicas e instrumentalidades, la obligación de implantar la política pública ambiental, con el fin de lograr una mejor calidad de vida y un balance entre los habitantes de Puerto Rico y nuestros recursos naturales. 12 L.P.R.A. §§ 1123, 1124.

A ese fin, el Artículo 4(c) de la LPPA exige que antes de *"efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente"*, el ente gubernamental deberá someter una Declaración de Impacto Ambiental o DIA. ■ 12 L.P.R.A. § 1124. En este sentido, una DIA es resultado del proceso de análisis de una propuesta de acción gubernamental desde el punto de vista de su efecto sobre el ambiente y los riesgos a la salud pública, una vez se concluye que la acción propuesta puede impactar el ambiente de forma significativa. Artículo 4 (c) de la LPPA y Sección 2.1 (h) del *Reglamento Sobre Declaraciones de Impacto Ambiental de la JCA,* ■ Reglamento Número 3106 de 4 de junio de 1984, ambos vigentes al momento de aprobarse la consulta de ubicación y la EA para el proyecto objeto de este recurso. En cuanto a la EA, este reglamento la define como *"un proceso que la agencia proponente seguirá para determinar si la acción propuesta tendrá o no posible impacto ambiental significativo sobre la calidad del medio ambiente y la salud pública"*. Sección 2.1(p), Reglamento 3106 de la JCA (énfasis nuestro).

A su vez, el impacto ambiental significativo se define como *"el efecto substancial (positivo o negativo) de una acción propuesta sobre uno o varios elementos del ambiente, tales como, pero sin limitarse a una población biótica, un recurso natural, el ambiente estético o cultural, la calidad de vida, la salud pública, los recursos renovables y no renovables; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo o viceversa, disponiéndose que cada uno de los elementos aquí enumerados será evaluado independientemente y en conjunto"*. Sección 2.1(u), Reglamento 3106 de la JCA. En este contexto, la EA es *"un proceso público conçiso el cual proveerá suficiente información a la agencia proponente para que ésta determine la necesidad de preparar una DIA Preliminar o una Declaración de Impacto Ambiental No-Significativo"*. Sección 3.1.1, Reglamento 3106 de la JCA. ■

## III

Como se sabe, el recurso de *mandamus* es un auto discrecional altamente privilegiado, mediante el cual se ordena a una o varias personas naturales, en este caso a un funcionario público, cumplir un acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes. 32 L.P.R.A. § 3421. Este recurso *"está concebido para obligar a cualquier persona, corporación, junta o tribunal inferior a cumplir un acto que la ley particularmente le ordena como un deber resultante de un empleo, cargo o función pública, cuando ese deber no admite discreción en su ejercicio, sino que es ministerial"*. Rivé, David, *El Mandamus en Puerto Rico*, 46 Rev. C. Abo. P.R. 15, 19 (1985).

Es norma reiterada que para expedir un auto de *mandamus* los tribunales deben considerar, como condición previa, los siguientes factores: *"el posible impacto que éste pueda tener sobre los intereses públicos que puedan estar [involucrados]; [...] evitar una intromisión indebida en los procedimientos del poder ejecutivo, y que el auto no se preste a confusión o perjuicios de los derechos de terceros"*. *Noriega v. Hernández Colón*, 135 D.P. R. 406, 448 (1994). No hay duda que al momento de decidir sobre la expedición del auto, cobra particular importancia el posible impacto que pudiera tener ésta sobre los intereses públicos. De ordinario, el posible impacto público que tendrá la expedición del *mandamus* será proporcional a la importancia del deber ministerial que se alega ha sido incumplido y que se pretende vindicar mediante el *mandamus*.

La Ley Sobre Política Pública Ambiental, según enmendada por la Ley 324, *supra*, provee, en su Artículo

20 lo siguiente:

 *"Cualquier persona natural o jurídica podrá llevar acciones en daños y perjuicios en los Tribunales de Justicia contra cualquier otra persona natural o jurídica basada en daños que sufran por violaciones a este Capítulo. Esta acción civil será independiente y diferente de los procesos administrativos que se sigan ante la Junta. Igualmente, cualquier persona natural o jurídica, afectada por la falta de implementación de este capítulo, podrá acudir al Tribunal de Primera Instancia en solicitud de que se expida un mandamus para que se cumpla con lo dispuesto en este capítulo". Disponiéndose, no obstante, que dicho recurso no procederá para cuestionar una decisión de la Junta de Calidad Ambiental dando por cumplidos los requisitos de la sec. 1124 (c) de este título al considerar un documento ambiental, lo que se hará exclusivamente en virtud de lo dispuesto en la Ley de Procedimiento Administrativo Uniforme."* 12 L.P.R.A. § 1139.

 El *mandamus* dispuesto por el Artículo 20 de la LPPA, no es idéntico al del Artículo 650 del Código de Enjuiciamiento Civil de Puerto Rico, 32 L.P.R.A. § 3422. Esto, en virtud de que la LPPA es una *"ley especial que ha adoptado un recurso extraordinario como el medio idóneo para remediar violaciones a sus preceptos".* *Colón Cortés v. Pesquera, supra,* a la pág. 995. Por tanto, cuando se invoca el *mandamus* bajo el Art. 20 de la LPPA, los principios rectores de la figura jurídica establecida en el Código de Enjuiciamiento Civil son aplicables solamente en tanto y en cuanto sean compatibles con la ley especial que lo ha adoptado como remedio. *Ibid.*

 El Artículo 20 de la LPPA convirtió el *mandamus* en una acción pública para exigir al Estado el cumplimiento riguroso de su deber ministerial, constitucional y continuo, de conservar el ambiente y velar por el uso prudente de nuestros recursos. De esta forma, se concedió al ciudadano común legitimación activa para, de forma sencilla y simple, solicitar la observancia seria y escrupulosa de la política pública ambiental. *Colón Cortés v. Pesquera, supra,* la pág. 996.

 Según expresó nuestro Tribunal Supremo en *Colón Cortés v. Pesquera, supra,* si bien la resolución favorable de la JCA respecto a una evaluación ambiental de ordinario merece gran deferencia, *"[n]o obstante, **dicha aprobación no necesariamente inmuniza a la agencia proponente** de una reclamación subsiguiente. Una resolución aprobatoria no puede relevar a la agencia proponente de satisfacer **en la realidad** los requisitos establecidos en la Ley Sobre Política Pública Ambiental y su reglamentación complementaria".* *Colón Cortés v. Pesquera, supra,* la pág. 989-90 (énfasis en el original). Por eso: *"[C]uando la gestión fiscalizadora de la JCA falle, la Declaración de Impacto Ambiental no se prepare de buena fe, se haga de una manera pro forma, o la acción propuesta tenga efectos no previstos, las personas afectadas tienen, mediante el auto de mandamus establecido en el Art. 20, supra, el poder de recurrir a los tribunales para obligar a la agencia proponente a ajustar sus actos a la política pública ambiental".* *Colón Cortés v. Pesquera, supra,* la pág. 990.

 El tribunal de instancia erró al desestimar la petición de la Coalición bajo el fundamento de que las determinaciones administrativas de la JCA y la JP eran finales y no podían ser revisadas en esta etapa de los procedimientos, pues la Coalición no limita su planteamiento a la corrección de las decisiones administrativas que autorizan el proyecto cuestionado. Realmente, el planteamiento principal de la Coalición es que han ocurrido cambios en el área a ser desarrollada que son posteriores a la aprobación de la consulta de ubicación y hacen necesario actualizar la evaluación ambiental preparada originalmente para dicho proyecto. Estos cambios, según sus alegaciones, son suficientes para requerir la preparación de una DIA. Como los cambios ocurrieron todos después de la aprobación de la consulta de ubicación, la controversia que tenía ante sí el tribunal de instancia no le requería revisar las determinaciones administrativas de la JCA y la JP, sino determinar si a la luz de los cambios en las áreas aledañas al desarrollo propuesto, era necesario actualizar la evaluación ambiental del proyecto aprobado. Esta es una determinación que el Tribunal puede realizar por la vía del *mandamus* de manera independiente y diferente de los procesos administrativos originales, 12 L.P.R.A. §

1139, para determinar si las agencias vienen obligadas ministerialmente, en estos momentos, a requerir la preparación de una DIA.

Reconociendo que el mandato de preservar y utilizar adecuadamente el ambiente y nuestros recursos naturales es uno que *"debe observarse rigurosamente, y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste"*, ▮ en *Misión Industrial de P.R. v. Junta de Calidad Ambiental*, 145 D.P. R. 908, 926 (1998), nuestro Tribunal Supremo se expresó como sigue:

*"Aun después de haber comenzado las operaciones, si el proyecto contemplado por la agencia proponente no se desarrolló o se llevó a cabo según descrito en la declaración de impacto ambiental, o si las consecuencias ambientales previstas en dicha declaración han resultados ser más graves que lo anticipado, o si surgen impactos adversos no previstos, **la Junta de Calidad Ambiental tiene la facultad y el deber de tomar todas las medidas adecuadas para evitar cualquier daño al ambiente o a los recursos naturales que pueda por ello ocurrir,** y el hecho de que la Junta haya aprobado antes una declaración de impacto ambiental, en modo alguno impide que se tome[n] tales medidas."* 12 L.P.R.A. § 1131(14), (22), (29) y (30). (Enfasis en el original.) ▮

Por último, señalamos que la expedición de un auto de *mandamus* en los casos apropiados *"no representa una intervención indebida del poder judicial en las atribuciones de otras ramas del gobierno"*, puesto que la Ley sobre Política Pública Ambiental *"impone un claro deber público..."*. *Salas Soler v. Sec. de Agricultura*, 102 D.P.R. 716, 726 (1974). Consecuentemente y cónsono con dicha declaración de política pública, el Tribunal Supremo ha expresado que *"[a]l interpretar los remedios establecidos en la Ley Sobre Política Pública Ambiental, resolvimos que éstos son "tanto para evitar como para atender daños al medio ambiente no previstos en una declaración de impacto ambiental o que resulten de una declaración que no fue preparada o aprobada de buena fe". Misión Industrial de P.R. v. Junta de Calidad Ambiental, supra*, a la pág. 926; *Colón Cortés v. Pesquera, supra*, a la pág. 996. ▮

## IV

Por los fundamentos anteriormente expresados, expedimos el recurso de autos, revocamos la sentencia recurrida y devolvemos el caso al Tribunal de Primera Instancia para que de conformidad con la Regla 55 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 55, celebre una vista evidenciaria con miras a determinar si los cambios propuestos al área próxima al desarrollo aprobado en la consulta de ubicación 93-17-0435-JPU, que son posteriores a la evaluación ambiental que se preparó al momento de presentarse dicha consulta, constituyen el *"impacto ambiental significativo"* que amerita la preparación de una DIA según dispone el Artículo 4(c) de la LPPA. Cónsono con ello, dispondrá si debe conceder los remedios extraordinarios solicitados.

Lo ordena y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 2002 DTA 146**

**1.** La consulta de ubicación tiene el número 93-17-0435-JPU y fue aprobada por la Junta de Planificación mediante resolución el 18 de octubre de 1995.

**2.** El 11 de febrero de 2002, los codemandados la JCA, la JP y Parque de Capuchino presentaron sus respectivas oposiciones a la petición y mociones de desestimación.

**3.** En su parte pertinente, la sección 4.2 de la LPAU dispone actualmente como sigue:

*"La revisión judicial aquí dispuesta será el recurso exclusivo para revisar los méritos de una decisión administrativa sea ésta de naturaleza.adjudicativa o de naturaleza informa[l] al amparo de este capítulo".*

**4.** Al momento de aprobarse la consulta de ubicación de Parque de Capuchino se encontraba vigente el Reglamento 3106, sobre Declaraciones de Impacto Ambiental. La sección 5.2 de dicho Reglamento requería la preparación de una DIA en las siguientes situaciones: *"a. Cualquier proyecto o acción que pueda tener efectos significativos primarios o secundarios sobre el medio ambiente; b. Cualquier proyecto o acción que pueda violar las normas de calidad ambiental establecidas por la reglamentación de la JCA o por la reglamentación federal o que pueda disminuir los beneficios del medio ambiente; c. Cualquier proyecto o acción para el cual se haya determinado que conlleva la utilización de una parte substancial de la infraestructura disponible en el área donde éste se proponga ubicar. Dicha determinación será tomada por la o las instrumentalidades públicas que habrán de proveer el servicio o la infraestructura; d. Cualquier proyecto que vaya a ser ubicado en una zona donde la contaminación sea de tal naturaleza que pueda conllevar efectos adversos a la salud y el bienestar de los seres humanos que habitarán o utilizarán dicho proyecto y sus alrededores; e. Cualquier proyecto o acción que pueda afectar significativamente un área en donde existen recursos naturales o valores de importancia ecológica recreativa, social, cultural o arqueológica; f. Cualquier proyecto o acciones por etapas que individualmente no requerirían una DIA, pero que en conjunto podrían tener un impacto significativo acumulativo, el·cual requiere una DIA que integre todas las etapas; g. Relleno sanitario de desperdicios sólidos peligrosos y no peligrosos; y h. Fuentes mayor de emisión".*

**5.** Apoyan su contención en lo resuelto en *Misión Industrial y otros v. Junta de Planificación*, 142 D.P.R. 656;·681-682 (1997).

**6.** La Regla 225 del RPPETDA dispone que el término de vigencia de una EA que termine en una DIA Negativa y que haya cumplido con el procedimiento de evaluación es de 5 años contados a partir del momento en que la determinación de la JCA sobre cumplimiento con las disposiciones del artículo 4-C de la LPPA *"advenga final y firme, hasta que se comience o realice la acción propuesta, siempre y cuando no se incorporen cambios significativos al proyecto propuesto".* Sin embargo, la Regla 227 del RPPETDA dispone que los documentos ambientales sometidos a la JCA previo a la vigencia de dicho reglamento, serían evaluados y procesados de conformidad a las disposiciones del reglamento vigente a la fecha de su presentación ante la JCA.

**7.** Parque de Capuchino expone que la Coalición alega que la sentencia apelada resolvió que *"la revisión administrativa es el recurso exclusivo para cuestionar el incumplimiento con el mandato constitucional de conservación de recursos".* Sin embargo, señala que lo resuelto en dicha sentencia fue *"declarar NO HA LUGAR la petición de la Coalición al resolver, como cuestión de umbral, que la Petición pretende revisar colateralmente decisiones administrativas que ya advinieron finales y firmes".*

**8.** Específicamente, imputa que la Coalición alega que por el predio de terreno discurre una quebrada, que en el predio existe una gran cantidad de árboles endémicos, que el predio del proyecto propuesto comprende los terrenos de la residencia del exgobernador Luis Muñoz Marín, y que la evaluación ambiental no evaluó el propuesto Bosque Urbano Inés María Mendoza Rivera, el propuesto Parque Urbano del Este, y el propuesto Corredor Ecológico de San Juan, todo ello para *"cautivar la atención de este Honorable Tribunal".*

**9.** En lo pertinente, el artículo lee literalmente: *"[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad...".*

**10.** La LPPA requiere al proponente del proyecto que la DIA deberá detallar lo siguiente: *"(1) El impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse; (2) cual[es]quiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la propuesta legislación, si se efectuare la acción o promulgare la decisión gubernamental; (3) alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión; (4) la relación entre usos locales a corto plazo del medio ambiente de hombre y la conservación y mejoramiento de la productividad a largo plazo, y (5) cualquier compromiso irrevocable o irreparable de los recursos que estarían envueltos en la legislación propuesta si la misma se implementara, en la acción gubernamental si se efectuara o en la decisión si se promulgara".*

**11.** Como dijimos anteriormente, este reglamento era el que se encontraba vigente al momento de presentarse la consulta de ubicación del proyecto que da margen al caso de autos. Posteriormente fue anulado en su totalidad por el Reglamento 6026 de 29 de septiembre de 1999, el cual estaba vigente el 2 de octubre de 2001, fecha en que la JP concedió la quinta extensión a la consulta de ubicación 93-17-0435-JPU.

**12.** El Reglamento 6026 de 29 de septiembre de 1999, *Reglamento para la Presentación, Evaluación y Trámite de Documentos Ambientales ("RPETDA")*, anuló en su totalidad el Reglamento 3106. Sin embargo, al examinar las definiciones provistas por el nuevo reglamento, en lo que respecta a la DIA y la EA, son esencialmente las mismas. La Regla 203 del Reglamento 6026 define la DIA como *"el documento ambiental presentado por una agencia proponente para cumplir con los requisitos del Artículo 4-C de la LPPA, cuando se ha determinado que la acción propuesta conllevará un impacto significativo sobre el ambiente"*. Por su parte, una EA es un documento ambiental presentado por una agencia proponente para determinar si la acción propuesta tendrá o no posible impacto ambiental significativo. Con respecto a la definición de impacto ambiental significativo, textualmente es la misma en ambos reglamentos.

**13.** Los cambios propuestos tanto por el municipio de San Juan como por el Proyecto del Senado 403 de 2001 son: el Bosque Urbano Inés María Mendoza Rivera, el Parque Urbano del Este, el propuesto Corredor Ecológico de San Juan, y la designación como sitio histórico de la residencia del exgobernador Luis Muñoz Marín.

**14.** 12 L.P.R.A § 1124. (Enfasis nuestro.)

**15.** Reiterado en *Municipio de Loíza v. Sucesiones de Marcial Suárez y de Encarnación Fuentes*, Op. de 11 de junio de 2001, **2001 J.T.S. 87**, a la pág. 1371. Allí también se reiteró que: *"[p]ara hacer valer la obligación de la agencia proponente bajo la Ley Núm. 9, la parte afectada tiene disponible el recurso de mandamus y el recurso de injunction"*. *Municipio de Loíza v. Sucesiones de Marcial Suárez y de Encarnación Fuentes, supra*, a la pág. 1372.

**16.** La exposición de motivos de la Ley 324, *supra*, reconoce que *"el mismo medioambiente es altamente cambiante, lo cual de por sí provoca que cualquier análisis o estudio pueda quedar obsoleto a corto o mediano plazo"*. Por otra parte, dicha exposición de motivos también hace meridianamente claro que la preocupación legislativa que se quiso atender al incorporar el *"disponiéndose"* que hemos citado a la sección 19 de la LPPA fue el que no se considerara la decisión de la JCA producto del proceso de evaluación ambiental como distinta al resultado de los procesos decisionales de otras agencias. Por eso, la exposición de motivos aclara que la disponibilidad del recurso de *mandamus "no significará que el proceso administrativo, de naturaleza informal, que se sigue al evaluar un documento ambiental deba tener un tratamiento distinto de otras decisiones administrativas"*. Todo ello, con miras a que no se utilice el *mandamus* para revisar los méritos de dichas decisiones, lo cual obviamente presupone cuestionamientos basados en hechos contemporáneos al proceso decisional, contrario a lo aquí alegado.